## Thompson v. Cincinnati, New Orleans & Texas Pacific Railway Company, et al.

(Decided June 4, 1915.)

### Appeal from Pulaski Circuit Court.

1. Trial—Action—Election.—A plaintiff in a personal injury action who states a cause of action both under the State law and the Federal Act, should be required to elect under which law he will proceed.

2.  Trial—Election—Dismissal.—After one who states a cause of action both against the carrier and his co-employe, has elected to proceed under the Federal Act, the action must be dismissed as against the co-employe, because the Federal Act provides only for a recovery against a "common carrier by railroad while engaged in commerce between any of the several states."

3.  Railroads—Construction of Repair Shops—Interstate Commerce.— Where repair shops are already in use as an instrumentality of interstate commerce, but have become inadequate for the purpose for which they were used, and an extension thereof was being constructed, and the construction had so far proceeded that it was being made use of as a store house for engines in connection with the original shops, the extension was in use as an instrumentality of interstate commerce.

4.  Railroads—Extension of Repair Shops—Interstate Commerce.— The building of an extension to repair shops already in use as an instrumentality of interstate commerce which is designed to make the original shops more effective as such an instrumentality is a work in aid and furtherance of interstate commerce from its very beginning.

5.  Negligence—Personal Injuries.—It is negligence for a foreman, who is present directing the work, and who sees the situation in which the workmen are placed, to direct one workman to do a thing which he might have known from the situation of another workman would probably result in his injury.

ROBERT HARDING, O'REAR & WILLIAMS, J. W. RAWLINGS and ROBERT WADDLE for appellant.

JOHN GALVIN and O. H. WADDLE & SONS for appellees.

OPINION OF THE COURT BY JUDGE TURNER—Reversing.

For some years prior to the 7th of May, 1914, appellee company owned and operated at Ferguson, Pulaski County, Kentucky, certain repair shops wherein its engines, which were engaged in both interstate and intrastate commerce, were repaired.

The shops being inadequate for the purpose for which they were used, some time prior to May, 1914, the company began the erection of certain additions to or extensions of their shops, and appellant, while engaged as a member of a carpenter crew working on one of the extensions, was injured, and brought this action against the company and two of his co-employes, charging that the injury was the result of their gross negligence.

The negligence relied on is that the defendant company had prepared a section of said extension, which was intended to be placed in and form a part thereof at

a point about sixty feet from the ground, and that the said section, which weighed about five hundred pounds, was elevated to that point by the aid of ropes and pulleys; at which point the plaintiff, the foreman Cundiff, and others were located for the purpose of placing said section into its proper position; that after said section had been so elevated the foreman wrongfully and negligently ordered his co-workers to push, prize, and place said section into a position so that it might be placed into and form a part of said building, and that his said co-workers, in obeying said wrongful and negligent order of the foreman, wrongfully and negligently prized, pushed, and shoved said section so that the same came against plaintiff's body with great violence and force, crushing his body, back, spine, and nerves, and paralyzing the lower part of his body and legs, whereby he was permanently injured. It is also alleged that the company was negligent in having said section so intended to be placed into said building too large to go into the same at the place where it was intended to go.

It is alleged that at the time the injuries were received the work in which he was engaged was necessary to be done, and was being done, in aid and furtherance of both intrastate and interstate commerce in which said defendant company was engaged.

Upon the motion of the defendants the plaintiff was required to elect whether he would prosecute his suit to recover under the Federal Employers' Liability Act or under the State law, and being so required to elect he elected to prosecute the same under the Federal act. After having so elected, the defendants entered a motion to require the plaintiff to elect whether he would prosecute the suit against the railway company or against the individual defendants, Cundiff and Massie, and being required to so elect he elected to prosecute the same against the railway company, and the suit was dismissed as against the individual defendants.

Thereafter the defendant filed its answer denying any negligence, denying that at the time of the plaintiff's injury he was engaged in aid and furtherance of interstate commerce, relying upon contributory negligence in mitigation of damages, and pleading assumed risk.

At the conclusion of the plaintiff's evidence, upon motion of the defendant company, the court directed the jury to return a verdict for the defendant, solely upon

the ground that the plaintiff was not at the time he received his injuries engaged in interstate commerce, and from that action of the court this appeal results.

Three grounds for reversal are urged: (1) That the court erred in requiring appellant to elect whether he would prosecute his action under the State law or the Federal act; (2) that the court erred in dismissing the plaintiff's petition as against the individual appellees, Cundiff and Massie; (3) that the court erred in directing a verdict for the defendant company.

The first proposition has been directly passed upon by this court. The case of South Covington & Cincinnati Street Ry. Co. v. Finan's Admx., 153 Ky., 340, was an action for personal injuries, resulting in death, while the employe was engaged in interstate commerce; the cause of action was stated in three separate numbered paragraphs, the first paragraph being a statement of the facts showing how the accident happened, together with certain allegations as to the car and its equipment; the second paragraph alleged that the car upon which decedent was employed was an instrument of interstate commerce, and described the defective condition thereof, and that the decedent's injuries and death were caused by the willful carelessness and negligence of the company while so engaged in interstate commerce; the third paragraph, after again reciting the manner in which the accident happened and repeating the allegations as to the defective equipment of the car, set up a cause of action under a statute of the State of Ohio, in which State the accident occurred. The lower court overruled a motion of defendant to require the plaintiff to elect under which statute it would proceed, and the court, after pointing out the difference between the Federal act and the Ohio statute, said:

"It was, therefore, impossible for the court to proceed under both statutes; it must of necessity proceed under one, and discard the other. In view, therefore, of the fact that the Federal act superseded the Ohio statute, it necessarily controlled this case, which is admitted by all parties to be a case of interstate commerce. In instructing under the Ohio statute, and in refusing to require the plaintiff to elect under which paragraph of the petition she would prosecute her case, the circuit court was in error."

The case of L. & N. R. R. Co. v. Strange's Admx., 156 Ky., 349, was where the plaintiff alleged that the decedent at the time of his injuries from which he died was engaged in the service of an interstate carrier as a brakeman upon a train which at the time was being used and operated either in interstate or intrastate commerce, and it was pleaded in the alternative, as is authorized by our Code, that one or the other of these two state of facts was true, but that plaintiff did not know which. The trial court overruled defendant's motion to require the plaintiff to elect whether he would proceed under the State law or the Federal act, and this court, after pointing out in detail the many differences between the State law and the Federal act, and clearly demonstrating the impracticability of proceeding under them both at one and the same time, held that the lower court was in error in not requiring the plaintiff to elect, even though he had pleaded in the alternative as expressly authorized by the Code.

It would seem from these two opinions that the question of practice involved is settled in this jurisdiction.

After the court had properly required the plaintiff to elect whether he would proceed under the Federal act or the State law, and he had elected to proceed under the former, it necessarily followed that the action must be dismissed as against the two individual defendants who were the co-employes of appellant, for the Federal act provided only for recovery by employes against a "common carrier by railroad while engaged in commerce between any of the several States," and nowhere, either expressly or by inference, provides for a recovery by one employe against his co-employes. To have overruled this motion, after the election to proceed under the Federal act, would have left pending one action under the Federal act against the carrier, and another under the State law against the individual defendants.

The remaining question is, was appellant at the time he received his injury engaged in furtherance or aid of interstate commerce? At that time the gable end of the old part of the shops had been torn out, whereby, as we understand the record, it and the extension were thrown into one; tracks had been laid in the extension, pits dug, and cranes and other machinery used in repairing and handling engines had been installed therein, and several engines had already been run into the extension on the

tracks already laid therein, and a few engines had already been "set in there for temporary work; just to have them out of the way while they worked," as said by one witness. At least two other witnesses state that at the time engines had been placed in the extension on the tracks laid therein.

This state of facts suggests two inquiries: First, was not the extension of the building actually in use by the company as an instrumentality of interstate commerce when the engines were stored in it? And, second, even though no use, whatsoever, had been made of the extension, was it not from its very beginning merely an adjunct to, and so intimately connected with, the original building, which was already in use as an instrumentality of interstate commerce, that the extension must be treated and considered as a part of it?

This evidence shows conclusively that the extension was already in use, at least to the extent of making a storehouse out of it, where engines were temporarily stored so as to relieve the crowded condition in the older part of the shops, thereby facilitating the repair work therein. Suppose from the beginning there had been no purpose except to use the extension as a store house, certainly from the very time any engines were stored therein it would have been merely an adjunct to and a part of the original shops, and thereby be in use as a part of the original shops.

So that we think, under the evidence, the extension was already in use in connection with the older shops as an instrumentality of interstate commerce, and the work that appellant was doing at the time was in aid and furtherance of the same.

In the case of Pederson v. Deleware, L. & W. R. Co., 229 U. S., 146, an employe while engaged in carrying a sack of bolts or nuts to be used in repairing an interstate bridge, was injured, and the Supreme Court of the United States, in discussing the proposition whether he was or not engaged at the time in interstate commerce, said:

"So we are only concerned with the nature of the work in which the plaintiff was employed at the time of his injury. Among the questions which arise in this connection are these: Was that work being done independently of the interstate commerce, in which defendant was engaged, or was it so closely connected there-

with as to be a part of it? Was its performance a matter of indifference, so far as that commerce was concerned, or was it in the nature of a duty resting on the carrier? The answers are obvious. Tracks and bridges are as indispensable to interstate commerce by railroad as are engines and cars, and sound economic reasons unite with settled rules of law, in demanding that all these instrumentalities be kept in repair. The security, expedition and efficiency of the commerce depends in large measure upon this being done. Indeed the statute now before us proceeds on the theory that the carrier is charged with the duty of exercising appropriate care to prevent or correct 'any defect or insufficiency  *  *  * in its cars, engines, appliances, machinery, tracks, roadbed, works, boats, wharves, or other equipment,' used in interstate commerce. But independently of the statute, we are of the opinion that the work of keeping such instrumentalities in a proper state of repair, while thus used, is so clearly related to such commerce as to be in practice and legal contemplation a part of it.

"The contention to the contrary proceeds upon the assumption that interstate commerce by railroad can be separated into its several elements, and the nature of each determined regardless of its relation to others or to the business as a whole. But this is an erroneous assumption. The true test always is: Is the work in question a part of interstate commerce in which the carrier is engaged?  *  *  *  Of course, we are not here concerned with the construction of tracks, bridges, engines, or cars, which have not as yet become instrumentalities in such commerce, but only with the work of maintaining them after they have become such instrumentalities and during their use as such. True, a track or bridge may be used in both interstate and intrastate commerce, but when it is so used, it is none the less an instrumentality of the former, nor does its double use prevent the employment of those who are engaged in its repair or in keeping it in suitable condition for use, from being an employment in interstate commerce."

As said by the court in that case, the vital question is, was that work being done independently of interstate commerce, or was it so closely connected therewith as to be a part thereof?

Manifestly engines are a necessary part of interstate commerce, and clearly such commerce cannot be prop-

erly or efficiently maintained unless those engines are kept in proper repair; plainly they cannot be kept in proper repair without well-equipped and ample repair shops; when those repair shops become inadequate or insufficient to promptly and efficiently keep the engines so engaged in interstate commerce in proper repair, and it becomes necessary to extend or build additions to said shops and install new machinery and appliances therein to the end that the repair work may be more promptly and efficiently done, does not it necessarily follow that one so engaged in this work of extension is working in aid and furtherance of interstate commerce? The nuts and bolts in the Pederson case were necessary to keep in repair the bridge being used in interstate commerce; the extension in this case was necessary to keep in repair and to promptly and efficiently repair engines engaged in such commerce.

The question is, was the extension to the repair shops wholly a new instrumentality designed to be used in the future in aid and furtherance of interstate commerce—but which had not yet been put to such use—or was it merely an addition to or repairing of an instrumentality already in such use?

There can be no doubt that if it had been an original structure intended to be used as an instrumentality of interstate commerce, but which had never been actually put to such use, the Federal act could not be invoked. But here we have a very different state of case. The distinction between the erection of an original structure intended to be used as a repair shop for engines engaged in interstate commerce, but which has not yet been put to that use, and the erection of an extension or addition to a building which is already being used as such repair shop, is apparent. The one is an original undertaking, which has not yet been impressed with its characteristic as an instrumentality of interstate commerce, while the other is merely an annex to or enlargement of a building being already so used, and from its very inception is necessarily looked upon and regarded as a part of and impressed with the nature of the parent structure. No matter how large the extension or addition, if it is to be used in the same business and forms a part of the original building, and is to be used in connection with the work done therein, it is nothing more than a repairing of that building that the work may be more efficiently

and promptly executed; and if the old structure is already in use as an instrumentality of interstate commerce, necessarily any repairing or extension designed to make it more effective as such an instrumentality is a work in furtherance of or aid to interstate commerce.

We cannot escape the conclusion that appellant was at the time of his injury engaged in aid of interstate commerce: (1) Because the extension was already in use as a storehouse in connection with the original building, which was confessedly being used as an instrumentality of interstate commerce; and (2) because the extension from the very beginning of its erection must be deemed and treated as a part of the original shops.

But it is insisted for the appellee company that, even though the case be held to be one under the Federal act, that there was no negligence shown as against the company, and for that reason the peremptory instruction was properly given, although it was given by the trial court solely upon the other ground.

The sections which were being placed in the gable end of the extension had been taken from the gable end of the old building, which was of the same dimensions as the gable end of the extension, and the plan of placing these sections, about fifteen in number, had been adopted by the workmen, under the direction of the foreman and sub-foreman, of raising them from the outside by means of ropes and pulleys, and placing them in position from the outside, one crew of men remaining on the ground, under the direct charge of the foreman, operating the pulleys, and the other crew, to which appellant belonged, being up in the building and handling the section after it reached the point where it was to be placed. All of the sections had been so placed from the outside, and they were at work placing the last section, which would have closed that end of the extension, when the injury happened, and that part of the crew, to which appellant belonged, and which was in charge of the sub-foreman Cundiff, was at the time at the top of the building about sixty feet from the ground. When this last section reached the top, by means of the pulleys, one or two attempts to place it in position from the outside were made, when it was observed by Cundiff that there was nailed to the section a piece of studding or timber, which made it impossible to so place the same in the

space where it was intended to go; thereupon he ordered that the section be pulled in from the outside with the purpose of attempting to place it from the inside; a rope was tied around the section, fastened to some of the timbers of the building, and after it was brought to the inside one end of it became fastened in some of the timbers of the building, whereupon the foreman directed appellant to take hold of the larger end of the section, which was not fastened, and while he had hold of that end the foreman directed another workman, Massie, to prize loose the other end of the section which was fastened. Appellant's back, while he so had hold of the larger end of the section, was against an iron brace, which was a part of the building, and when Massie prized the other end loose the whole section, which, as we understand from the record, was swinging by the rope fastened to the timbers above, swung against appellant and crushed him against the iron brace. The sub-foreman Cundiff was present, directing the work, and knew the dangerous position in which appellant was placed by reason of his order to take hold of that end of the section and his position with reference to the iron brace, and might easily have foreseen that when the other end was loosened the whole weight of the section would come against appellant and force his body against the iron brace.

In the first place, it was negligence to send the section up with the purpose to have it placed from the outside, the way in which all the work had been done up to that time, when there was nailed on it a strip or piece of timber which made it impossible for the section to be placed as it was intended; and, in the next place, as indicated above, it was negligence for the sub-foreman Cundiff to direct Massie to prize loose the end, which was fastened, when he knew from the situation of appellant at the time, or might easily have known, that the weight of the whole section when loosened would come against appellant and crush him against the iron brace. The case should have been submitted to the jury.

For the reasons given the judgment is reversed, with directions to grant appellant a new trial, and for further proceedings consistent herewith.